United States Court of Appeals
For the First Circuit



No. 95-1956

LOMAS MORTGAGE, INC.,

Appellant,

v.

ESPERANDIEU & ANTONINE LOUIS,

Appellees.



APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Edward F. Harrington, U.S. District Judge] 



Before

Lynch, Circuit Judge, 
Aldrich and Bownes, Senior Circuit Judges. 



John J. Monaghan, with whom Deborah Paige Stone and Sherburne, 
Powers & Needham, P.C. were on brief, for appellant Lomas Mortgage, 
Inc.
Gary Klein, with whom National Consumer Law Center, Joseph G. 
Albiani and Joseph G. Albiani and Associates were on brief, for 
appellees Esperandieu and Antonine Louis.



April 18, 1996


LYNCH, Circuit Judge. At issue is the important LYNCH, Circuit Judge. 

question of whether 1322(b)(2) of the Bankruptcy Code, 11

U.S.C. 1322(b)(2), prevents Chapter 13 debtors from

"stripping down" their primary residence mortgages when the

debtors reside in a multi-family house. "Stripping down"

would advantage such homeowners by permitting them to cap the

dollar amount of the security interest in the home to the

home's actual value rather than the higher amount of the note

itself. The difference would be treated as unsecured debt.

That advantage is denied to resident single-family homeowners

by 1322(b)(2).

This case thus raises the question of whether the

"strip down"1 protections which Congress denied to owners

residing in single-family homes, in order to encourage the

flow of residential mortgage funds, are nonetheless available

to owner occupants of multi-family housing. We hold that

Congress intends exactly such different results and that the

antimodification provision of 1322(b)(2) does not bar

modification of a secured claim on a multi-unit property in

which one unit is the debtor's principal residence and the

security interest extends tothe other income-producing units.

 

1. The term "strip down" is a colloquialism used to describe
the process by which a secured creditor's lien is limited to
the market value of its collateral. The term "cram down" is
also commonly used to describe this process. See, e.g., In 
re Wilson, 174 B.R. 215, 218 n.2 (Bankr. S.D. Miss. 1994); In 
re Lutz, 164 B.R. 239, 241 (Bankr. W.D. Pa. 1994), rev'd on 
other grounds, 192 B.R. 107 (W.D. Pa. 1995).  

-2- 2

Esperandieu and Antonine Louis own a three-family

home at 221 Spring Street in Brockton, Massachusetts. Lomas

Mortgage, Inc. holds the mortgage on the property. The

mortgage secures a note executed on February 19, 1987, for

$159,300. The mortgage is in the standard FNMA form for

single-family dwellings, with the standard FNMA one- to four-

family rider, including an assignment of rents. The Louises

hold a one-half interest in the property. The other half is

owned by Mr. Louis's brother, who occupies a second unit.

The third unit is leased to tenants.

Between the time of the 1987 mortgage and the

filing of the bankruptcy petition on January 22, 1995,

Massachusetts suffered a severe recession. The recession

resulted in a general decline in property values, in

unemployment, and other harsh realities. The Louises'

neighborhood in Brockton was not immune and foreclosures in

the neighborhood became common. Eventually, the Louises

themselves could not meet their mortgage payments. They

defaulted on the note held by Lomas, and Lomas started

foreclosure proceedings. The Louises filed a voluntary

petition under Chapter 13, and the foreclosure was stayed.

The Louises then moved to bifurcate or "strip down"

Lomas's claim into a secured claim for the actual value of

the property, agreed to be $80,000, and an unsecured claim

-3- 3

for the balance, citing 11 U.S.C. 506(a).2 The Louises

could not take advantage of 506(a), however, if Lomas's

security for the note extended only to real property that is

the Louises' principal residence. That is because

1322(b)(2), which governs Chapter 13 plans, provides:

(b) Subject to subsections (a) and (c) of
this section, the plan may --

(2) modify the rights of
holders of secured claims,
other than a claim secured only 
by a security interest in real 
property that is the debtor's 
principal residence, or of 
holders of unsecured claims, or
leave unaffected the rights of
holders of any class of claims.

11 U.S.C. 1322(b)(2) (emphasis supplied).

The Supreme Court has held that the "other than"

language of 1322(b)(2), called an "antimodification

 

2. Section 506(a) provides, in pertinent part:

An allowed claim of a creditor secured by
a lien on property in which the estate
has an interest . . . is a secured claim
to the extent of the value of such
creditor's interest in the estate's
interest in such property . . . and is an
unsecured claim to the extent that the
value of such creditor's interest . . .
is less than the amount of such allowed
claim.

11 U.S.C. 506(a). Section 506(a) allows a debtor to limit
a creditor's secured claim to the value of the underlying
collateral. Any amount of the secured claim exceeding the
value of the collateral becomes unsecured. Section 506(a) is
a general provision under Chapter 5 of the Bankruptcy Code
and thus is applicable to individual bankruptcy cases under
Chapter 13. See 11 U.S.C. 103(a). 

-4- 4

provision," In re Hammond, 27 F.3d 52, 55 (3d Cir. 1994), 

bars bifurcation where the creditor's secured claim "is

secured only by a lien on the debtor's principal residence."

Nobelman v. American Sav. Bank, 508 U.S. 324, 332 (1993). In 

Nobelman, the Supreme Court addressed a Chapter 13 plan to 

modify a home mortgage lender's secured claim on joint

debtors' owner-occupied condominium. The debtors owed

$71,335 in principal, interest, and fees under a note payable

to the lender and secured by a deed of trust on the

condominium. The debtors' Chapter 13 plan proposed to make

monthly payments required by the note up to $23,500, the

value of the residence, and, relying on 506(a), to treat

the remainder of the lender's claim as unsecured. Id. at 

326. The lender objected to the plan, asserting that,

506(a) notwithstanding, 1322(b)(2) prohibited the debtors

from modifying its rights under the note secured by the deed

of trust on the condominium. Although noting that the

debtors were correct to seek valuation pursuant to 506(a)

in order to determine whether the lender in fact held a

secured claim, the Court held that the valuation

determination under 506(a) "does not necessarily mean that

the 'rights' the bank enjoys as a mortgagee, which are

protected by 1322(b)(2), are limited by the valuation of

its secured claim [under 506(a)]." Id. at 329. 

-5- 5

Determining that the term "rights" in 1322(b)(2)

refers to rights reflected in the relevant mortgage

instrument enforceable by state law, the Court held that 

1322(b)(2) prohibited the debtor from bifurcating the

lender's claim into secured and unsecured portions. Id. at 

331-32. Because the lender's contractual rights were

contained in a unitary note, it would be impossible for the

debtor to modify the rights of the lender as to the unsecured

portion of its claim without also modifying the terms of the

secured component. Id. Thus, the court held, "to give 

effect to 506(a)'s valuation and bifurcation of secured

claims through a Chapter 13 plan in the manner petitioners

propose would require a modification of the rights of the

holder of the security interest." Id. at 332. Thus Nobelman 

provides that if a lender's claim "is secured only by a lien

on the debtor's principal residence," id., bifurcation under 

506(a) will, in most cases, be prohibited.

Nobelman, however, did not address the question of 

what secured claims would be considered "secured only by a

security interest in real property that is the debtor's

principal residence." 11 U.S.C. 1322(b)(2). Nobelman 

noted that one of the purposes of the provision was to give

special protection to home lenders in order to encourage the

flow of capital into the home lending market. See Nobelman, 

508 U.S. at 332 (Stevens, J., concurring) (citing Grubbs v. 

-6- 6

Houston First Am. Sav. Ass'n, 730 F.2d 236, 245-46 (5th Cir. 

1984)). The precise question of whether home lenders whose

security interest extended beyond the principal residence to

other property or other income-producing components of the

principal residence could be considered to have claims

secured "only by a security interest in real property that is

the debtor's principal residence" was not raised in Nobelman. 

This case raises that question.

In their motion before the bankruptcy court, the

Louises argued that the antimodification provision of

1322(b)(2), as interpreted by Nobelman, did not reach the 

security interest Lomas had on 221 Spring Street because

Lomas's security interest extended to the entire property,

including the income-producing components. Lomas objected,

arguing that 1322(b)(2)'s antimodification provision

applied because its security interest was only on 221 Spring

Street and the property included the Louises' principal

address. The bankruptcy court agreed with the Louises and

allowed the motion to bifurcate. The district court affirmed

the order and Lomas appeals. Review of the bankruptcy

court's conclusion of law is de novo. See In re Winthrop Old 

Farm Nurseries, Inc., 50 F.3d 72, 73 (1st Cir. 1995). 

The Louises' "principal residence" is 221 Spring

Street. Were the property a single-family house,

1322(b)(2)'s antimodification provision surely would apply

-7- 7

and bar bifurcation, assuming Lomas's security interest did

not extend to any other property. See, e.g., In re Hammond, 

27 F.3d 52 (3d Cir. 1994) (note secured by home and by

personal property within the home is outside scope of

antimodification provision); see also 5 Collier on Bankruptcy 

1322.06[1][a], at 1322-21 to 1322-23 (Lawrence P. King ed.,

15th ed. 1995) (a claim secured by any other real property or

by personal property of the estate or debtor, or by personal

property of another may be modified by the Chapter 13 plan).

Starting, as they should, with the language of

1322(b)(2), see Consumer Prod. Safety Comm'n v. GTE 

Sylvania, Inc., 447 U.S. 102, 108 (1980) ("the starting point 

for interpreting a statute is the language of the statute

itself"), Lomas and the Louises present competing

constructions of the statutory language. Lomas argues that

the term "only" modifies "by a security interest in real

property" and the term "that is the debtor's principal

residence" further modifies "real property." Lomas's reading

results in 1322(b)(2) applying when (1) the security

interest is only in real property (as opposed to personal,

intangible or other non-real property) and (2) the real

property is the "debtor's principal residence." Under this

reading, there is no need that the real property be "only"

the debtor's principal residence.

-8- 8

The Louises, in contrast, argue (1) that "only"

modifies the entire phrase "by a security interest in real

property that is the debtor's principal residence"; and (2)

that the word "is" requires complete and exclusive identity

between "real property" and "principal residence."3

Lomas criticizes the Louises' reading on the ground

that the statutory language does not explicitly state that

the real property must be "exclusively" the debtor's

principal residence. The Louises criticize Lomas's reading

on the ground that the statutory language does not explicitly

state that the real property must merely "contain" or

"include" the principal residence.

The "plain meaning" approach to 1322(b)(2)

appears to us to be, in the end, inconclusive. The disputed

terms could (as Lomas claims) serve the limited purpose of

distinguishing security interests in real property from

security interests in personal or other property. But they

could also (as the Louises claim) serve the more general

 

3. The Louises' reading is the approach preferred in the
case law. See In re Adebanjo, 165 B.R. 98, 104 (Bankr. D. 
Conn. 1994) (collecting cases); accord In re McGregor, 172 
B.R. 718, 720 (Bankr. D. Mass. 1994) ("If [Congress intended
to extend 1322(b)(2) to multi-unit buildings,] the statute
should refer to real property that 'includes' the residence.
Instead, the word 'is' appears, which more aptly describes an
equivalence between the real estate and the residence."); In 
re Legowski, 167 B.R. 711, 714-15 (Bankr. D. Mass. 1994) 
(employing same plain meaning argument); but see In re 
Guilbert, 165 B.R. 88, 90 (Bankr. D.R.I. 1994) (rejecting 
that plain meaning approach), rev'd on other grounds, 176 
B.R. 302 (D.R.I. 1995).

-9- 9

purpose of distinguishing lenders secured only by a principal

residence from lenders who may have additional security. Cf. 

In re Legowski, 167 B.R. 711, 714 n.9 (Bankr. D. Mass. 1994) 

("Meaning is always plain to the proponent of an

interpretation."). "When ambiguity is identified, a dispute

about a statute's or regulation's proper construction cannot

be resolved simply by placing the gloss of 'plain meaning' on

one competing interpretation." Massachusetts v. Blackstone 

Valley Elec. Co., 67 F.3d 981, 986 (1st Cir. 1995).  

Given the lack of plain meaning, we turn to

legislative history for guidance. See United States v. 

O'Neil, 11 F.3d 292, 297-98 (1st Cir. 1993) (resort to 

legislative history is proper where "there is room for

disagreement" over the meaning of statutory language). The

legislative history of 1322(b)(2) does not clearly resolve

the issue.

Section 1322(b)(2) was enacted as part of the

Bankruptcy Code of 1978. The Bankruptcy Code of 1978 was the

culmination of a legislative process that began in 1970, the

year the Congress created the Commission on the Bankruptcy

Laws of the United States. In 1973 the Commission issued a

report containing its findings and recommendations and a

draft bill. Section 6-201(2) of the Commission's draft bill

was the predecessor of what eventually became 1322(b)(2).

It provided that a plan under Chapter 13 "may include

-10- 10

provisions dealing with claims secured by personal property

severally, on any terms, and may provide for the curing of

defaults within a reasonable time and otherwise alter or

modify the rights of the holders of such claims." Report of

the Commission on the Bankruptcy Laws of the United States,

H.R. Doc. No. 137, 93d Cong., 1st Sess., pt. II, at 204

(1973). The focus of this provision was on modification of

claims secured by personal property. It apparently would

have left largely untouched then existing law in which

security interests in real property were excluded from the

provisions of Chapter XIII. See id. pt. I, at 165 (stating 

that claims that may be dealt with under Chapter XIII include

secured and unsecured claims, but that claims secured by

estates in real property or "chattels real" were excluded

from Chapter XIII).4

But the bill as reported out of the House, H.R.

8200, had quite different language in 1322(b)(2) than that

proposed by the Commission Report. H.R. 8200 provided in

1322(b)(2) that a debtor's plan might "modify the rights of

holders of secured claims or of holders of unsecured claims."

See H.R. 8200, 95th Cong., 1st Sess. 1322(b)(2) (1977). 

 

4. The Commission did provide in section 6-201(4) that a
plan may include provisions for curing defaults within a
reasonable time on claims secured by a lien on the debtor's
residence. See Report on the Commission on the Bankruptcy 
Laws of the United States, H.R. Doc. No. 137, 93d Cong., 1st
Sess., pt. II, at 204. 

-11- 11

Although the accompanying House Report did not specifically

state that this language would allow for modification of

secured claims in real as well as personal property, see H.R. 

Rep. No. 595, 95th Cong., 1st Sess. 124 (1977), the report

does not suggest that the term "claim" which otherwise has

quite broad application, should somehow be limited to claims

in personal property in this context.

H.R. 8200 was passed by the House and sent to the

Senate, but the Senate chose to consider simultaneously

S. 2266, which had been reported out of the Senate Judiciary

Committee on July 14, 1978. The version of 1322(b)(2) in

S. 2266 provided that a debtor's plan may "modify the rights

of holders of secured claims (other than claims wholly

secured by mortgages on real property) or of holders of

unsecured claims." S. 2266, 95th Cong., 2d Sess.

1322(b)(2) (1978).

This language, which would preclude modification of

any claim wholly secured by a real estate mortgage, appears

to have been the product of testimony given during hearings

before a Senate Judiciary Committee subcommittee to the

effect that H.R. 8200 would cause "residential mortgage

lenders to be extraordinarily conservative in making loans in

cases where the general financial resources of the individual

borrower are not particularly strong." See Hearings Before 

the Subcomm. on Improvements of the Judicial Machinery of the

-12- 12

Senate Comm. on the Judiciary, 95th Cong., 1st Sess. 707

(1977) (statement of Edward J. Kulik, Senior Vice President,

Real Estate Div., Mass. Mut. Life Ins. Co.). Mr. Kulik

recommended that H.R. 8200 should be changed so that, at the

least, "a mortgage on real property other than investment

property may not be modified." Id. at 714. When Mr. Kulik 

was specifically asked about the effect of the bill on

individual home mortgages (as opposed to its effect on

limited partnerships), Mr. Kulik's attorney, Robert O'Malley,

asked to speak and said, "savings and loans will continue to

make loans to individual homeowners, but they will tend to

be, I believe, extraordinarily conservative and more

conservative than they are now in the flow of credit." Id. 

at 715.

The final version of 1322(b)(2) came after H.R.

8200 and S. 2266 (passed by the Senate as an amendment to

H.R. 8200) were shaped into a compromise bill through a

series of agreed-upon floor amendments. As part of that

process, the Senate backed off its position that no

modifications would be permitted of any mortgage secured by

real estate and agreed to more limited antimodification

language for 1322(b)(2). Modification would not be allowed

on claims "secured only by a security interest in real

-13- 13

property that is the debtor's principal residence." 11

U.S.C. 1322(b)(2).5

This legislative history does tend to show that

with 1322(b)(2) Congress wanted to benefit the residential

mortgage market as opposed to the entire real estate mortgage

market. It also might suggest that a distinction should be

drawn between the residential mortgage market and the market

for investment property. Nevertheless, the legislative

history does not state with clarity how a mortgage on a mixed

property, one with both residential and investment

characteristics, should be treated. While Congress debated

over whether to protect all real estate lenders or no real

estate lenders and eventually compromised on protecting

residential mortgages, Congress did not focus on what to do

in the multi-family context.

 

5. The explanatory statement of the provision, while
noting the Senate's compromise on the mortgage issue, does
not state the extent of the compromise:

Section 1322(b)(2) of the House amendment
represents a compromise agreement between
similar provisions in the House bill and
Senate amendment. Under the House
amendment, the plan may modify the rights
of holders of secured claims other than a
claim secured by a security interest in
real property that is the debtor's
principal residence. It is intended that
a claim secured by the debtor's principal
residence may be treated with under
section 1322(b)(5) of the House
amendment.

124 Cong. Rec. H11106 (daily ed. Sept. 28, 1978).

-14- 14

Lomas suggests that there is no need for such

specific evidence in the legislative history. According to

Lomas, it is enough that Congress intended to protect home

mortgage lenders. Lomas argues that a mortgage on a three-

family house is just as much a "home" mortgage as a mortgage

on a single-family house, and that any distinction between a

three-family and one-family for these purposes is arbitrary.

If one accepts this premise,6 Lomas's point has some force.

If the antimodification provision is meant to encourage home

lending, then excluding multi-family houses would tend to

harm (in relative terms) those purchasing property in urban

neighborhoods, where owner-occupied multi-unit housing would

tend to be more common, and to favor those purchasing single-

family homes, more common in suburbia. The theory is that

lenders would face relatively more risk of modification in

the case of default in urban areas, and interest rates on

loans in those areas would rise accordingly. The legislative

history certainly does not show Congress intended the 

antimodification provision of 1322(b)(2) to benefit

suburbanites to a greater degree than city dwellers.

Still, the legislative history is silent on the

scope of the incentive Congress wished to give home lenders.

Congress certainly could have viewed single-family homes as

 

6. The Louises dispute this assertion. They claim that the
underwriting practices for two- to four-family houses are
different from those for single-family houses. 

-15- 15

less likely to be secured by other collateral, such as rents,

than multi-family properties. Further, condominiums are

common in cities and a condominium in which the debtor

resides is covered by the antimodification provision. See 

Nobelman, 508 U.S. at 332. This blunts some of the force of 

Lomas's claim that the Louises' interpretation would create a

disparate and perhaps unfair application of the

antimodification provision. 

Additionally, extending the antimodification

provision to multi-family houses would also create a

difficult line-drawing problem. It is unlikely Congress

intended the antimodification provision to reach a 100-unit

apartment complex simply because the debtor lives in one of

the units. Limiting the antimodification provision to

single-family dwellings creates a more easily administered

test.

We are left then without clear guidance on the

question here from either the language or contemporaneous

legislative history of 1322(b)(2). But there is guidance

from another source: the amendments to Chapter 11 contained

in the Bankruptcy Reform Act of 1994, Pub. L. No. 103-394,

108 Stat. 4106 (1994) (codified in scattered sections of 11

U.S.C.). In those amendments Congress referred favorably to

case law under Chapter 13 holding that the antimodification

provision did not apply to multi-family housing, and

-16- 16

established that it wished petitions under Chapter 11 and

Chapter 13 to treat the matter in the same way.

As part of the 1994 Act and post-Nobelman, Congress 

added for the first time a home mortgagee antimodification

provision to Chapter 11. See Pub. L. No. 103-394, Title II, 

206, Oct. 22 1994, 108 Stat. 4123 (codified at 11 U.S.C.

1123(b)(5)) (a Chapter 11 plan may "modify the rights of

holders of secured claims, other than a claim secured only by

a security interest in real property that is the debtor's

principal residence"). The antimodification language of

1123(b)(5) is identical to that of 1322(b)(2). The

legislative history of 1123(b)(5) reveals that Congress

deliberately tracked the antimodification language of

1322(b)(2) and intended conformity of treatment between

Chapter 13 and Chapter 11:

This amendment conforms the treatment of
residential mortgages in chapter 11 to
that in chapter 13, preventing the
modification of the rights of a holder of
a claim secured only by a security
interest in the debtor's principal
residence.

H.R. Rep. No. 835, 103d Cong., 2d Sess. 46 (1994), reprinted 

in 1994 U.S.C.C.A.N. 3340, 3354. 

More importantly, the legislative history of

1123(b)(5) specifies the limits of its antimodification

provision. That history specifies that the antimodification

provision of 1123(b)(5)

-17- 17

does not apply to a commercial property,
or to any transaction in which the
creditor acquired a lien on property
other than real property used as the
debtor's residence.

Id. (footnote omitted). This passage from the Judiciary 

Committee Report refers to In re Ramirez, 62 B.R. 668 (Bankr. 

S.D. Cal. 1986), as an example of a case in which the

antimodification provision of Chapter 11 would not apply.

See H.R. Report No. 835 at 46 n.13. Ramirez, a case 

construing the antimodification provision of 1322(b)(2),

squarely holds that the antimodification provision of

1322(b)(2) does not apply to multi-unit houses where the

security interest extends to the rental units.7 Given this

clear expression of congressional intent, the inference

becomes quite strong that Congress believes the

antimodification provision in Chapter 13 does not reach such

multi-unit properties. Cf. 5 Collier on Bankruptcy, supra,  

1322.06[1][a], 1322-23 n.13 (stating that Ramirez was cited 

by Congress in the Bankruptcy Reform Act of 1994 as a correct

statement of the current law of 1322(b)(2)). 

That this evidence from the 1994 Act is a species

of subsequent, not contemporaneous, legislative history gives

us little pause. "Although subsequent legislative history is

 

7. In Ramirez the lender held a security interest in 
property that consisted of the debtor's principal residence
and two rental units. See 62 B.R. at 668-69. The facts of 
Ramirez do not appear to be distinguishable in any relevant 
way from the facts here.

-18- 18

less authoritative than contemporaneous explanation,

subsequent Congressional declaration of an act's intent is

entitled to great weight in statutory construction."

Roosevelt Campobello Int'l Park Comm'n v. E.P.A., 711 F.2d 

431, 436-37 (1st Cir. 1983) (citing Seatrain Shipbuilding 

Corp. v. Shell Oil Co., 444 U.S. 572, 596 (1980)). The 1994 

Act evidences a deliberate choice on the part of Congress

under Chapter 11 to exclude security interests in multi-unit

properties like that here from the reach of the

antimodification provision based on its understanding that

Chapter 13's antimodification provision did not reach such

security interests. To disregard such evidence would

frustrate the uniform treatment under Chapters 11 and 13 of

secured interests in debtors' principal residences that was

so clearly Congress's aim in amending 1123(b)(5).

We hold that the antimodification provision of

1322(b)(2) does not bar modification of a secured claim on

a multi-unit property in which one of the units is the

debtor's principal residence and the security interest

extends to the other income-producing units. Because Lomas's

security interest extends to the additional rental units of

221 Spring Street, the antimodification provision of

-19- 19

1322(b)(2) does not apply to that interest, and bifurcation

pursuant to 506(a) is appropriate.8

If we are wrong as to what Congress intended,

legislation can provide a correction. Affirmed. Parties to 

bear their own costs.  

 

8. The Louises have presented an alternative theory for
holding the antimodification provision of 1322(b)(2)
inapplicable to Lomas's security interest in 221 Spring
Street. The Louises point out that Lomas is entitled to the
rents from 221 Spring Street under an assignment of rents
provision. The Louises argue that under Massachusetts law
the assignment of rents provision is additional security in
other, non-real property, and that, consequently, the
antimodification provision would not apply. See Hammond, 27 
F.3d at 57. Lomas disputes the Louises' interpretation of
Massachusetts law, however, arguing that in Massachusetts an
assignment of rents is not separate from a mortgagee's
interest in the real property. In light of our disposition
of the case, we need not resolve this question. 

-20- 20