UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT



No. 96-2001

UNITED STATES OF AMERICA,
Appellant,

v.

NIPPON PAPER INDUSTRIES CO., LTD., ET AL.,
Defendants, Appellees.



APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro, U.S. District Judge] 



Before

Selya, Circuit Judge, 

Coffin, Senior Circuit Judge, 

and Lynch, Circuit Judge. 



Mark S. Popofsky, Attorney, Antitrust Division, U.S. Dep't 
of Justice, with whom Anne K. Bingaman, Assistant Attorney 
General, Joel I. Klein, Deputy Assistant Attorney General, John 
J. Powers, III, Robert B. Nicholson, David A. Blotner, Lisa M. 
Phelan, and Reginald K. Tom, Attorneys, Antitrust Division, were 
on brief, for the United States.
Richard G. Parker, with whom Geoffrey D. Oliver, Alan M. 
Cohen, O'Melveny & Myers LLP, William H. Kettlewell, and Dwyer & 
Collora were on brief, for Nippon Paper Industries Co., Ltd. 
John G. Roberts, Jr., David G. Leitch, H. Christopher 
Bartolomucci, and Hogan & Hartson L.L.P. on brief for Government 
of Japan, amicus curiae.



March 17, 1997


SELYA, Circuit Judge. This case raises an important, SELYA, Circuit Judge. 

hitherto unanswered question. In it, the United States attempts

to convict a foreign corporation under the Sherman Act, a federal

antitrust statute, alleging that price-fixing activities which

took place entirely in Japan are prosecutable because they were

intended to have, and did in fact have, substantial effects in

this country. The district court, declaring that a criminal

antitrust prosecution could not be based on wholly

extraterritorial conduct, dismissed the indictment. See United 

States v. Nippon Paper Indus. Co., 944 F. Supp. 55 (D. Mass. 

1996). We reverse.

I. JUST THE FAX I. JUST THE FAX

Since the district court granted the defendant's motion

to dismiss for failure to state a prosecutable offense, we draw

our account of the pertinent events from the well-pleaded facts

in the indictment itself. See United States v. National Dairy 

Prods. Corp., 372 U.S. 29, 33 n.2 (1963). 

In 1995, a federal grand jury handed up an indictment

naming as a defendant Nippon Paper Industries Co., Ltd. (NPI), a

Japanese manufacturer of facsimile paper.1 The indictment

alleges that in 1990 NPI and certain unnamed coconspirators held

a number of meetings in Japan which culminated in an agreement to
 

1The grand jury also named another Japanese manufacturer,
Jujo Paper Co., Ltd. (Jujo), as a codefendant. Two years
earlier, however, NPI had been formed and, the government
alleges, had assumed Jujo's assets and liabilities. Because the
issue of successor liability is not before us, we treat NPI as if
it were the sole defendant and as if it, rather than Jujo, were
alleged to have committed the acts described in the indictment.

2

fix the price of thermal fax paper throughout North America. NPI

and other manufacturers who were privy to the scheme purportedly

accomplished their objective by selling the paper in Japan to

unaffiliated trading houses on condition that the latter charge

specified (inflated) prices for the paper when they resold it in

North America. The trading houses then shipped and sold the

paper to their subsidiaries in the United States who in turn sold

it to American consumers at swollen prices. The indictment

further relates that, in 1990 alone, NPI sold thermal fax paper

worth approximately $6,100,000 for eventual import into the

United States; and that in order to ensure the success of the

venture, NPI monitored the paper trail and confirmed that the

prices charged to end users were those that it had arranged.

These activities, the indictment posits, had a substantial

adverse effect on commerce in the United States and unreasonably

restrained trade in violation of Section One of the Sherman Act,

15 U.S.C. 1 (1994).

NPI moved to dismiss because, inter alia, if the 

conduct attributed to NPI occurred at all, it took place entirely

in Japan, and, thus, the indictment failed to limn an offense

under Section One of the Sherman Act. The government opposed

this initiative on two grounds. First, it claimed that the law

deserved a less grudging reading and that, properly read, Section

One of the Sherman Act applied criminally to wholly foreign

conduct as long as that conduct produced substantial and intended

effects within the United States. Second, it claimed that the

3

indictment, too, deserved a less grudging reading and that,

properly read, the bill alleged a vertical conspiracy in

restraint of trade that involved overt acts by certain

coconspirators within the United States. Accepting a restrictive

reading of both the statute and the indictment, the district

court dismissed the case. See United States v. NPI, 944 F. Supp. 

at 64-66. This appeal followed.

II. ANALYSIS II. ANALYSIS

We begin and end with the overriding legal

question.2 Because this question is one of statutory

construction, we review de novo the holding that Section One of

the Sherman Act does not cover wholly extraterritorial conduct in

the criminal context. See United States v. Gifford, 17 F.3d 462, 

471-72 (1st Cir. 1994).

Our analysis proceeds in moieties. We first present

the historical context in which this important question arises.

We move next to the specifics of the case.

A. An Historical Perspective. A. An Historical Perspective. 

Our law has long presumed that "legislation of

Congress, unless a contrary intent appears, is meant to apply

only within the territorial jurisdiction of the United States."

EEOC v. Arabian American Oil Co., 499 U.S. 244, 248 (1991) 
 

2Inasmuch as we hold that activities committed abroad which
have a substantial and intended effect within the United States
may form the basis for a criminal prosecution under Section One
of the Sherman Act, we need not address the government's
alternative argument that the indictment in this case alleges
that some overt acts in furtherance of the conspiracy were
perpetrated in the United States.

4

(citation omitted). In this context, the Supreme Court has

charged inquiring courts with determining whether Congress has

clearly expressed an affirmative desire to apply particular laws

to conduct that occurs beyond the borders of the United States.

See id. 

The earliest Supreme Court case which undertook a

comparable task in respect to Section One of the Sherman Act

determined that the presumption against extraterritoriality had

not been overcome. In American Banana Co. v. United Fruit Co., 

213 U.S. 347 (1909), the Court considered the application of the

Sherman Act in a civil action concerning conduct which occurred

entirely in Central America and which had no discernible effect

on imports to the United States. Starting with what Justice

Holmes termed "the general and almost universal rule" holding

"that the character of an act as lawful or unlawful must be

determined wholly by the law of the country where the act is

done," id. at 356, and the ancillary proposition that, in cases 

of doubt, a statute should be "confined in its operation and

effect to the territorial limits over which the lawmaker has

general and legitimate power," id. at 357, the Court held that 

the defendant's actions abroad were not proscribed by the Sherman

Act.

Our jurisprudence is precedent-based, but it is not

static. By 1945, a different court saw a very similar problem in

a somewhat softer light. In United States v. Aluminum Co. of 

Am., 148 F.2d 416 (2d Cir. 1945) (Alcoa), the Second Circuit, 

5

sitting as a court of last resort, see 15 U.S.C. 29 

(authorizing designation of a court of appeals as a court of last

resort for certain antitrust cases), mulled a civil action

brought under Section One against a Canadian corporation for acts

committed entirely abroad which, the government averred, had

produced substantial anticompetitive effects within the United

States. The Alcoa court read American Banana narrowly; that 

case, Judge Learned Hand wrote, stood only for the principle that

"[w]e should not impute to Congress an intent to punish all whom

its courts can catch, for conduct which has no consequences

within the United States." Id. at 443. But a sovereign 

ordinarily can impose liability for conduct outside its borders

that produces consequences within them, and while considerations

of comity argue against applying Section One to situations in

which no effect within the United States has been shown the

American Banana scenario the statute, properly interpreted, 

does proscribe extraterritorial acts which were "intended to

affect imports [to the United States] and did affect them." Id. 

at 444. On the facts of Alcoa, therefore, the presumption 

against extraterritoriality had been overcome, and the Sherman

Act had been violated. See id. at 444-45. 

Any perceived tension between American Banana and Alcoa 

was eased by the Supreme Court's most recent exploration of the

Sherman Act's extraterritorial reach. In Hartford Fire Ins. Co. 

v. California, 509 U.S. 764 (1993), the Justices endorsed Alcoa's 

core holding, permitting civil antitrust claims under Section One

6

to go forward despite the fact that the actions which allegedly

violated Section One occurred entirely on British soil. While

noting American Banana's initial disagreement with this 

proposition, the Hartford Fire Court deemed it "well established 

by now that the Sherman Act applies to foreign conduct that was

meant to produce and did in fact produce some substantial effect

in the United States." Id. at 796. The conduct alleged, a 

London-based conspiracy to alter the American insurance market,

met that benchmark.3 See id. 

To sum up, the case law now conclusively establishes

that civil antitrust actions predicated on wholly foreign conduct

which has an intended and substantial effect in the United States

come within Section One's jurisdictional reach. In arriving at

this conclusion, we take no view of the government's asseveration

that the Foreign Trade Antitrust Improvements Act of 1982
 

3As NPI reminds us, four Justices dissented in Hartford 
Fire. This is cold comfort, however, for the dissenters 
expressed complete agreement with the majority's view on
extraterritoriality. See Hartford Fire, 509 U.S. at 814 (Scalia, 
J., dissenting). By the same token, NPI's attempt to distinguish
Hartford Fire on the ground that the defendants there conceded 
the United States' jurisdiction over their conduct fails for two
reasons.
In the first place, the assertion is no more than a play on
words. The majority opinion in Hartford Fire stated that the 
district court "undoubtedly" had jurisdiction over the civil
claims, "as the London reinsurers apparently concede." Id. at 
795. It is obvious, therefore, that jurisdiction did not depend
on the concession; to the contrary, jurisdiction would
"undoubtedly" have existed in any event. In the second place,
one of the London defendants did not join in this apparent
concession, but the Court nonetheless held that defendant's
foreign conduct to be within the Sherman Act's proscriptive ambit
because it was part of a scheme which "was intended to and did in
fact produce a substantial effect on the American insurance
market." Id. at 795 n.21. 

7

(FTAIA), 15 U.S.C. 6a (1994), makes manifest Congress' intent

to apply the Sherman Act extraterritorially. The FTAIA is

inelegantly phrased and the court in Hartford Fire declined to 

place any weight on it. See Hartford Fire, 509 U.S. at 796 n.23. 

We emulate this example and do not rest our ultimate conclusion

about Section One's scope upon the FTAIA.

B. The Merits. B. The Merits. 

Were this a civil case, our journey would be complete.

But here the United States essays a criminal prosecution for

solely extraterritorial conduct rather than a civil action. This

is largely uncharted terrain; we are aware of no authority

directly on point, and the parties have cited none.

Be that as it may, one datum sticks out like a sore

thumb: in both criminal and civil cases, the claim that Section

One applies extraterritorially is based on the same language in

the same section of the same statute: "Every contract,

combination in the form of trust or otherwise, or conspiracy, in

restraint of trade or commerce among the several States, or with

foreign nations, is declared to be illegal." 15 U.S.C. 1.

Words may sometimes be chameleons, possessing different shades of

meaning in different contexts, see, e.g., Hanover Ins. Co. v. 

United States, 880 F.2d 1503, 1504 (1st Cir. 1989), cert. denied, 

493 U.S. 1023 (1990), but common sense suggests that courts

should interpret the same language in the same section of the

same statute uniformly, regardless of whether the impetus for

interpretation is criminal or civil.

8

Common sense is usually a good barometer of statutory

meaning. Here, however, we need not rely on common sense alone;

accepted canons of statutory construction point in the same

direction. It is a fundamental interpretive principle that

identical words or terms used in different parts of the same act

are intended to have the same meaning. See Commissioner of 

Internal Revenue v. Lundy, 116 S. Ct. 647, 655 (1996); Gustafson 

v. Alloyd Co., 115 S. Ct. 1061, 1067 (1995). This principle  

which the Court recently called "the basic canon of statutory

construction," Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 

469, 479 (1992) operates not only when particular phrases

appear in different sections of the same act, but also when they

appear in different paragraphs or sentences of a single section.

See Russo v. Texaco, Inc., 808 F.2d 221, 227 (2d Cir. 1986) ("It 

is a settled principle of statutory construction that [w]hen the

same word or phrase is used in the same section of an act more

than once, and the meaning is clear as used in one place, it will

be construed to have the same meaning in the next place.")

(citations and internal quotation marks omitted); United States 

v. Gertz, 249 F.2d 662, 665 (9th Cir. 1957) (similar). It 

follows, therefore, that if the language upon which the

indictment rests were the same as the language upon which civil

liability rests but appeared in a different section of the

Sherman Act, or in a different part of the same section, we would

be under great pressure to follow the lead of the Hartford Fire 

Court and construe the two iterations of the language

9

identically. Where, as here, the tie binds more tightly that

is, the text under consideration is not merely a duplicate

appearing somewhere else in the statute, but is the original

phrase in the original setting the pressure escalates and the

case for reading the language in a manner consonant with a prior

Supreme Court interpretation is irresistible. See United States 

v. Thompson/Center Arms Co., 504 U.S. 505, 518 n.10 (1992) 

(plurality op.) (flatly rejecting the idea, while construing

language from a statute with both civil and criminal

implications, that a court should "refrain in criminal cases from

applying statutory language that would have been held to apply if

challenged in civil litigation").

The Supreme Court confronted an analogous situation in

Ratzlaf v. United States, 510 U.S. 135 (1994). There, the court 

dealt with a single criminal penalty clause, contained in 31

U.S.C. 5322(a) (1994), which authorized punishment for

individuals "willfully violating" a number of separate statutory

provisions. The defendant was charged under one of these

provisions. After noting that identical terms appearing at

multiple places within a single statute customarily have a

consistent meaning, the Court said: "We have even stronger cause

to construe a single formulation, here 5322(a), the same way 

each time it is called into play." Id. at 143. The Ratzlaf 

Court proceeded to interpret the phrase "willfully violating" to

incorporate the same mens rea requirement that had been read into

the phrase when section 5322(a) was applied in other contexts.

10

See id. at 136-37, 141. In so doing the Court quoted with 

approval our statement in United States v. Aversa, 984 F.2d 493, 

498 (1st Cir. 1993) (en banc): "Ascribing various meanings to a

single iteration . . . reading the word differently for each

code section to which it applies would open Pandora's jar. If

courts can render meaning so malleable, the usefulness of a

single penalty provision for a group of related code sections

will be eviscerated."

Ratzlaf is not our only teaching aid. This court 

recently confronted a situation that, putting together its

successive stages, throws light upon the problem at hand. Having

found an ambiguity in the phrase "cost of producing self-

employment income," 7 U.S.C. 2014(d)(9) (1994), we deferred to

a reasonable administrative regulation interpreting it. See 

Strickland v. Commissioner, Me. Dep't of Human Servs., 48 F.3d 

12, 21 (1st Cir.), cert. denied, 116 S. Ct. 145 (1995). In a 

subsequent suit involving the same parties, we debunked the

plaintiffs' contention, advanced in a somewhat different context

and in connection with a neoteric legal theory, that the phrase

in question had a plain meaning. We explained: "Statutory

ambiguity does not flash on and off like a bank of strobe lights

at a discotheque, shining brightly at the time of one lawsuit and

then vanishing mysteriously in the interlude before the next suit

appears." Strickland v. Commissioner, Me. Dep't of Human Servs., 

96 F.3d 542, 547 (1st Cir. 1996). Read in the ensemble, the

Strickland opinions stand for the proposition that the same 

11

phrase, appearing in the same portion of the same statute, cannot

bear divergent interpretations in different litigation contexts.

The shared rationale of the Ratzlaf and Strickland 

cases reinforces the basic canon of construction and gives us

confidence that we should follow the canon here. The words of

Section One have not changed since the Hartford Fire Court found 

that they clearly evince Congress' intent to apply the Sherman

Act extraterritorially in civil actions, and it would be

disingenuous for us to pretend that the words had lost their

clarity simply because this is a criminal proceeding. Thus,

unless some special circumstance obtains in this case, there is

no principled way in which we can uphold the order of dismissal.

NPI and its amicus, the Government of Japan, urge that

special reasons exist for measuring Section One's reach

differently in a criminal context. We have reviewed their

exhortations and found them hollow. We discuss the five most

promising theses below. The rest do not require comment.

1. Lack of Precedent. NPI and its amicus make much of 1. Lack of Precedent. 

the fact that this appears to be the first criminal case in which

the United States endeavors to extend Section One to wholly

foreign conduct. We are not impressed. There is a first time

for everything, and the absence of earlier criminal actions is

probably more a demonstration of the increasingly global nature

of our economy than proof that Section One cannot cover wholly

foreign conduct in the criminal milieu.

Moreover, this argument overstates the lack of

12

precedent. There is, for example, solid authority for applying a

state's criminal statute to conduct occurring entirely outside

the state's borders. See Strassheim v. Daily, 221 U.S. 280, 285 

(1911) (Holmes, J.) ("Acts done outside a jurisdiction, but

intended to produce and producing detrimental effects within it,

justify a State in punishing the cause of the harm as if he had

been present at the effect, if the State should succeed in

getting him within its power."). It is not much of a stretch to

apply this same principle internationally, especially in a

shrinking world. See, e.g., Chua Han Mow v. United States, 730 

F.2d 1308, 1311-12 (9th Cir. 1984) (applying Strassheim principle 

to conduct in Malaysia involving drugs intended for distribution

in the United States), cert. denied, 470 U.S. 1031 (1985); United 

States v. Hayes, 653 F.2d 8, 11 (1st Cir. 1981) (similar); cf. 

John Donne, Devotions Upon Emergent Occasions, no. 17 (1624) 

(warning that "no man is an island, entire of itself; every man

is a piece of the continent, a part of the main"). 

2. Difference in Strength of Presumption. The lower 2. Difference in Strength of Presumption. 

court and NPI both cite United States v. Bowman, 260 U.S. 94 

(1922), for the proposition that the presumption against

extraterritoriality operates with greater force in the criminal

arena than in civil litigation. This misreads the opinion. To

be sure, the Bowman Court, dealing with a charged conspiracy to 

defraud, warned that if the criminal law "is to be extended to

include those [crimes] committed outside of the strict

territorial jurisdiction, it is natural for Congress to say so in

13

the statute, and failure to do so will negative the purpose of

Congress in this regard." Id. at 98. But this pronouncement 

merely restated the presumption against extraterritoriality

previously established in civil cases like American Banana, 213 

U.S. at 357. The Bowman Court nowhere suggested that a 

different, more resilient presumption arises in criminal cases.4

Nor does United States v. United States Gypsum Co., 438 

U.S. 422 (1978), offer aid and succor to NPI. Recognizing that

"the behavior proscribed by the [Sherman] Act is often difficult

to distinguish from the gray zone of socially acceptable and

economically justifiable business conduct," id. at 440-41, the 

Gypsum Court held that criminal intent generally is required to 

convict under the Act. See id. at 443. Although this 

distinguishes some civil antitrust cases (in which intent need

not be proven) from their criminal counterparts, the Gypsum Court 

made it plain that intent need not be shown to prosecute

criminally "conduct regarded as per se illegal because of its 

unquestionably anticompetitive effects." Id. at 440. This 

means, of course, that defendants can be convicted of

participation in price-fixing conspiracies without any

demonstration of a specific criminal intent to violate the

antitrust laws. See, e.g., United States v. Brown, 936 F.2d 
 

4Indeed, the Bowman Court stated that it regarded American 
Banana as an appropriate analogy because the antitrust statute 
"is criminal as well as civil." 260 U.S. at 98. This seems to
support the notion that the presumption is the same in both
instances and leaves little room to argue that the Bowman Court 
was attempting to craft a special, more rigorous rule for
criminal proceedings.

14

1042, 1046 (9th Cir. 1991); United States v. Society of Indep. 

Gas. Marketers, 624 F.2d 461, 465 (4th Cir. 1980), cert. denied, 

449 U.S. 1078 (1981); United States v. Gillen, 599 F.2d 541, 544- 

45 (3d Cir.), cert. denied, 444 U.S. 1078 (1979). Because the 

instant case falls within that rubric, Gypsum does not help NPI. 

We add that even if Gypsum had differentiated between 

civil and criminal price-fixing cases, NPI's reliance on it would

still be problematic. Reduced to bare essence, Gypsum focuses on 

mens rea, noting that centuries of Anglo-American legal tradition

instruct that criminal liability ordinarily should be premised on

malevolent intent, see id. at 436-37, whereas civil liability, to 

which less stigma and milder consequences commonly attach, often

requires a lesser showing of intent. There is simply no

comparable tradition or rationale for drawing a criminal/civil

distinction with regard to extraterritoriality, and neither NPI

nor its amicus have alluded to any case which does so.

3. The Restatement. NPI and the district court, 944 3. The Restatement. 

F. Supp. at 65, both sing the praises of the Restatement (Third)

of Foreign Relations Law (1987), claiming that it supports a

distinction between civil and criminal cases on the issue of

extraterritoriality. The passage to which they pin their hopes

states:

[I]n the case of regulatory statutes that may
give rise to both civil and criminal
liability, such as the United States
antitrust and securities laws, the presence
of substantial foreign elements will
ordinarily weigh against application of
criminal law. In such cases, legislative
intent to subject conduct outside the state's

15

territory to its criminal law should be found
only on the basis of express statement or
clear implication.

Id. at 403 cmt. f. We believe that this statement merely 

reaffirms the classic presumption against extraterritoriality 

no more, no less. After all, nothing in the text of the

Restatement proper contradicts the government's interpretation of

Section One. See, e.g., id. at 402(1)(c) (explaining that, 

subject only to a general requirement of reasonableness, a state

has jurisdiction to proscribe "conduct outside its territory that

has or is intended to have substantial effect within its

territory");5 id. at 415(2) ("Any agreement in restraint of 

United States trade that is made outside of the United States . .

. [is] subject to the jurisdiction to prescribe of the United

States, if a principal purpose of the conduct or agreement is to

interfere with the commerce of the United States, and the

agreement or conduct has some effect on that commerce."). What

is more, other comments indicate that a country's decision to

prosecute wholly foreign conduct is discretionary. See, e.g., 

id. at 403 rep. n.8. 

4. The Rule of Lenity. The next arrow which NPI yanks 4. The Rule of Lenity. 

from its quiver is the rule of lenity. The rule itself is

venerable; it provides that, in the course of interpreting

statutes in criminal cases, a reviewing court should resolve

 

5We note in passing that, by their use of the disjunctive in
this section, the drafters of the Restatement seem to suggest a
more permissive standard then we, and other American courts, see, 
e.g., Alcoa, 148 F.2d at 444, would deem meet. 

16

ambiguities affecting a statute's scope in the defendant's favor.

See, e.g., Hughey v. United States, 495 U.S. 411, 422 (1990); 

Crandon v. United States, 494 U.S. 152, 158 (1990); United States 

v. Gibbens, 25 F.3d 28, 35 (1st Cir. 1994); United States v. 

Ferryman, 897 F.2d 584, 591 (1st Cir.), cert. denied, 498 U.S. 

830 (1990). But the rule of lenity is inapposite unless a

statutory ambiguity looms, and a statute is not ambiguous for

this purpose simply because some courts or commentators have

questioned its proper interpretation.6 See Reno v. Koray, 115 S. 

Ct. 2021, 2029 (1995); Moskal v. United States, 498 U.S. 103, 108 

(1990). Rather, "[t]he rule of lenity applies only if, after

seizing everything from which aid can be derived, [a court] can

make no more than a guess as to what Congress intended." Reno, 

115 S. Ct. at 2029 (citations, internal quotation marks, and

certain brackets omitted); accord United States v. O'Neil, 11 

F.3d 292, 301 n.10 (1st Cir. 1993) (describing the rule of lenity

as "a background principle that properly comes into play when, at

the end of a thorough inquiry, the meaning of a criminal statute

remains obscure"). Put bluntly, the rule of lenity cannot be

used to create ambiguity when the meaning of a law, even if not

readily apparent, is, upon inquiry, reasonably clear.

 

6Leaving aside the lower court's decision in this case, no
reported opinion has questioned the applicability of Hartford 
Fire's exercise in statutory construction to the precincts 
patrolled by the criminal law. Nevertheless, Hartford Fire's 
rendition of the statute has drawn criticism from the academy.
See, e.g., Kenneth W. Dam, Extraterritoriality in an Age of 
Globalization: The Hartford Fire Case, 1993 Sup. Ct. Rev. 289, 
307-13 (1993).

17

That ends the matter of lenity. In view of the fact

that the Supreme Court deems it "well established" that Section

One of the Sherman Act applies to wholly foreign conduct,

Hartford Fire, 509 U.S. at 796, we effectively are foreclosed 

from trying to tease an ambiguity out of Section One relative to

its extraterritorial application. Accordingly, the rule of

lenity plays no part in the instant case.

5. Comity. International comity is a doctrine that 5. Comity. 

counsels voluntary forbearance when a sovereign which has a

legitimate claim to jurisdiction concludes that a second

sovereign also has a legitimate claim to jurisdiction under

principles of international law. See Harold G. Maier, 

Extraterritorial Jurisdiction at a Crossroads: An Intersection 

Between Public and Private International Law, 76 A. J. Int'l L. 

280, 281 n.1 (1982). Comity is more an aspiration than a fixed

rule, more a matter of grace than a matter of obligation. In all

events, its growth in the antitrust sphere has been stunted by

Hartford Fire, in which the Court suggested that comity concerns 

would operate to defeat the exercise of jurisdiction only in

those few cases in which the law of the foreign sovereign

required a defendant to act in a manner incompatible with the

Sherman Act or in which full compliance with both statutory

schemes was impossible. See Hartford Fire, 509 U.S. at 798-99; 

see also Kenneth W. Dam, Extraterritoriality in an Age of 

Globalization: The Hartford Fire Case, 1993 Sup. Ct. Rev. 289, 

306-07 (1993). Accordingly, the Hartford Fire Court gave short 

18

shrift to the defendants' entreaty that the conduct leading to

antitrust liability was perfectly legal in the United Kingdom.

See Hartford Fire, 509 U.S. at 798-99. 

In this case the defendant's comity-based argument is

even more attenuated. The conduct with which NPI is charged is

illegal under both Japanese and American laws, thereby

alleviating any founded concern about NPI being whipsawed between

separate sovereigns. And, moreover, to the extent that comity is

informed by general principles of reasonableness, see Restatement 

(Third) of Foreign Relations Law 403, the indictment lodged

against NPI is well within the pale. In it, the government

charges that the defendant orchestrated a conspiracy with the

object of rigging prices in the United States. If the government

can prove these charges, we see no tenable reason why principles

of comity should shield NPI from prosecution. We live in an age

of international commerce, where decisions reached in one corner

of the world can reverberate around the globe in less time than

it takes to tell the tale. Thus, a ruling in NPI's favor would

create perverse incentives for those who would use nefarious

means to influence markets in the United States, rewarding them

for erecting as many territorial firewalls as possible between

cause and effect.

We need go no further. Hartford Fire definitively 

establishes that Section One of the Sherman Act applies to wholly

foreign conduct which has an intended and substantial effect in

the United States. We are bound to accept that holding. Under

19

settled principles of statutory construction, we also are bound

to apply it by interpreting Section One the same way in a

criminal case. The combined force of these commitments requires

that we accept the government's cardinal argument, reverse the

order of the district court, reinstate the indictment, and remand

for further proceedings.

Reversed and remanded. Reversed and remanded. 

Concurring Opinion follows  Concurring Opinion follows 

20

LYNCH, Circuit Judge (concurring). The question LYNCH, Circuit Judge (concurring).  

presented in this case is whether Section One of the Sherman

Act authorizes criminal prosecutions of defendants for their

actions committed entirely outside the United States.

Judicial precedents, culminating with the Supreme Court's

decision in Hartford Fire Insurance Co. v. California, 509 

U.S. 764 (1993), conclusively establish that Section One's

jurisdictional reach extends, in civil actions, to foreign

conduct that is meant to produce, and does in fact produce,

substantial effects in the United States. The next question

to be asked is whether there is any persuasive reason to

believe that, with regard to wholly foreign conduct, Section

One in the criminal context is not co-extensive with Section

One in the civil context.

In answering this second question, courts must be

careful to determine whether this construction of Section

One's criminal reach conforms with principles of

international law. "It has been a maxim of statutory

construction since the decision in Murray v. The Charming 

Betsy, 2 Cranch 64, 118, 2 L. Ed. 208 (1804), that 'an act of 

congress ought never to be construed to violate the law of

nations, if any other possible construction remains.'"

Weinberger v. Rossi, 456 U.S. 25, 32 (1982). In the Alcoa 

case, Judge Learned Hand found this canon of construction

relevant to determining the substantive reach of the Sherman

21

Act, observing that "we are not to read general words [i.e., 

Section One] . . . without regard to the limitations

customarily observed by nations upon the exercise of their

powers." United States v. Aluminum Co. of Am., 148 F.2d 416, 

443 (2d Cir. 1945); see also Hartford Fire, 509 U.S. at 814- 

15 (Scalia, J., dissenting). 

The task of construing Section One in this context

is not the usual one of determining congressional intent by

parsing the language or legislative history of the statute.

The broad, general language of the federal antitrust laws and

their unilluminating legislative history place a special

interpretive responsibility upon the judiciary. The Supreme

Court has called the Sherman Act a "charter of freedom" for

the courts, with "a generality and adaptability comparable to

that found . . . in constitutional provisions." Appalachian 

Coals, Inc. v. United States, 288 U.S. 344, 359-60 (1933). 

As Professors Areeda and Turner have said, the federal courts

have been invested "with a jurisdiction to create and develop

an 'antitrust law' in the manner of the common law courts."

I Areeda & Turner, Antitrust Law 106, at 15 (1978).7 The 

courts are aided in this task by canons of statutory

construction, such as the presumption against violating

 

7. Professors Areeda and Turner also note that "judges
sometimes talk as if Congress has already decided the
question before them. This is usually a misconception." Id. 

22

international law, which serve as both guides and limits in

theabsence of more explicit indicia of congressional intent. 

Here, we are asked to determine the substantive

content of Section One's inexact jurisdictional provision,

"commerce . . . with foreign nations." 15 U.S.C. 1.

Because of the "compunctions against the creation of crimes

by judges rather than by legislators," II Areeda & Hovenkamp,

Antitrust Law 311b, at 33 (1995 rev. ed.), the 

constitution-like aspects of the antitrust laws must be

handled particularly carefully in criminal prosecutions.

As the antitrust laws give the federal enforcement

agencies a relatively blank check, the development of

antitrust law has been largely shaped by the cases that the

executive branch chooses - or does not choose - to bring.

Accordingly it has been said that:

novel interpretations or great departures have
seldom, if ever, occurred in criminal cases, which
prosecutors have usually reserved for defendants
whose knowing behavior would be generally
recognized as appropriate for criminal sanctions.

Id. at 34. This case does present a new interpretation. We 

are told this is the first instance in which the executive

branch has chosen to interpret the criminal provisions of the

Sherman Act as reaching conduct wholly committed outside of

this country's borders.

Changing economic conditions, as well as different

political agendas, mean that antitrust policies may change

23

from administration to administration. The present

administration has promulgated new Antitrust Enforcement

Guidelines for International Operations which "focus

primarily on situations in which the Sherman Act will grant

jurisdiction and when the United States will exercise that

jurisdiction" internationally. Brockbank, The 1995 

International Antitrust Guidelines: The Reach of U.S. 

Antitrust Law Continues to Expand, 2 J. Int'l Legal Stud. 1, 

*22 (1996). The new Guidelines reflect a stronger

enforcement stance than earlier versions of the Guidelines,

and have been described as a "warning to foreign governments

and enterprises that the [antitrust enforcement] Agencies

intend to actively pursue restraints on trade occurring

abroad that adversely affect American markets or damage

American exporting opportunities." Id. at *21. The instant 

case is likely a result of this policy.

It is with this context in mind that we must

determine if the exercise of jurisdiction occasioned by the

decision of the executive branch of the United States is

proper in this case. While courts, including this one, speak

of determining congressional intent when interpreting

statutes, the meaning of the antitrust laws has emerged

through the relationship among all three branches of

government. In this criminal case, it is our responsibility

to ensure that the executive's interpretation of the Sherman

24

Act does not conflict with other legal principles, including

principles of international law.

That question requires examination beyond the

language of Section One of the Sherman Act. It is, of

course, generally true that, as a principle of statutory

interpretation, the same language should be read the same way

in all contexts to which the language applies. But this is

not invariably true. New content is sometimes ascribed to

statutory terms depending upon context. Cf. Robinson v. 

Shell Oil Co., 117 S. Ct. 843, 847 (1997) (depending on 

context, statutory term may have different meanings in

different sections of single statute); 3 Sutherland,

Statutory Construction 60.04 (5th ed. 1995) (statutes with 

both remedial and penal provisions may be construed liberally

in remedial context and strictly in penal context). As NPI

and the Government of Japan point out, the Supreme Court has

held that Section One of the Sherman Act, which defines both

criminal and civil violations with one general phrase,8

"should be construed as including intent as an element" of a

criminal violation. United States v. United States Gypsum 

Co., 438 U.S. 422, 443 (1978). Where Congress intends that 

our laws conform with international law, and where

international law suggests that criminal enforcement and

 

8. "Every contract, combination in the form of trust or
otherwise, or conspiracy, in restraint of trade or commerce .
. . is declared to be illegal . . . ." 15 U.S.C. 1.

25

civil enforcement be viewed differently, it is at least

conceivable that different content could be ascribed to the

same language depending on whether the context is civil or

criminal. It is then worth asking about the effect of the

international law which Congress presumably also meant to

respect.

The content of international law is determined "by

reference 'to the customs and usages of civilized nations,

and, as evidence of these, to the works of jurists and

commentators.'" Hilao v. Marcos, 103 F.3d 789, 794 (9th Cir. 

1996) (quoting The Paquete Habana, 175 U.S. 677, 700 (1900)); 

see also Kadic v. Karadzic, 70 F.3d 232 (2d Cir. 1995). The 

Restatement (Third) of the Foreign Relations Law of the

United States restates international law, as derived from

customary international law and from international agreements

to which the United States is a party, as it applies to the

United States. See Restatement (Third) of the Foreign 

Relations Law of the United States 1, 101 (1987) 

[hereinafter Restatement]. The United States courts have 

treated the Restatement as an illuminating outline of central

principles of international law. See Hartford Fire, 509 U.S. 

at 799 (citing Restatement); Hartford Fire, 509 U.S. at 818 

(Scalia, J., dissenting) ("I shall rely on the Restatement

(Third) of Foreign Relations Law for the relevant principles

of international law. Its standards appear fairly supported

26

in the decisions of this Court construing international

choice-of-law principles . . . and in the decisions of other

federal courts . . . ."); In re Maxwell Communications Corp., 

93 F.3d 1036, 1047-48 (2d Cir. 1996).

The Restatement articulates principles, derived

from international law, for determining when the United

States may properly exercise regulatory (or prescriptive)

jurisdiction over activities or persons connected with

another state. It serves as a useful guide to evaluating the

international interests at stake. Sections 402 and 403

articulate general principles. See Restatement 402, 403. 

Section 415 applies these principles to "Jurisdiction to

Regulate Anti-Competitive Activities." Id. 415. 

Restatement Section 402(1)(c) states that "Subject

to 403," a state has jurisdiction to prescribe law to

"conduct outside its territory that has or is intended to

have substantial effect within its territory." Id.  

402(1)(c). Section 403(1) states that, even when Section 402

has been satisfied, jurisdiction may not be exercised if it

is "unreasonable." Id. 403(1). Section 403(2) lists 

factors to be evaluated in determining if jurisdiction is

reasonable:

(a) the link of the activity to the territory of
the regulating state, i.e., the extent to 
which the activity takes place within the
territory, or has substantial, direct, and
foreseeable effect upon or in the territory; 

27

(b) the connections, such as nationality,
residence, or economic activity, between the
regulating state and the person principally
responsible for the activity to be regulated,
or between that state and those whom the
regulation is designed to protect; 

(c) the character of the activity to be regulated,
the importance of regulation to the regulating
state, the extent to which other states
regulate such activities, and the degree to
which the desirability of such regulation is
generally accepted; 

(d) the existence of justified expectations that
might be protected or hurt by the regulation; 

(e) the importance of the regulation to the
international political, legal, or economic
system;

(f) the extent to which the regulation is
consistent with the traditions of the
international system; 

(g) the extent to which another state may have an
interest in regulating the activity; and

(h) the likelihood of conflict with regulation by
another state. 

Id. 403(2).9 

Comment f to Section 403 states that the principles

of Sections 402 and 403 "apply to criminal as well as to

civil regulation." Id. 403 cmt. f. But, specifically 

naming the United States antitrust laws, the comment also

says that for statutes that give rise to both types of

liability, "the presence of substantial foreign elements will

 

9. Section 403(3) is not applicable here. See id. 403(3) 
cmt. e.

28

ordinarily weigh against application of criminal law." Id. 

The comment argues that legislative intent to apply these

laws criminally should only be found on the basis of "express

statement or clear implication." Id.  

While the majority opinion accurately states that

this comment is an expression of the clear statement rule,

the comment also implies that there are special concerns

associated with the imposition of criminal sanctions on

foreign conduct. See also id. 403 n.8 ("In applying the 

principle of reasonableness, the exercise of criminal (as

distinguished from civil) jurisdiction in relation to acts

committed in another state may be perceived as particularly

intrusive."). Indeed, most people recognize a distinction

between civil and criminal liability; that the law of nations

should do so as well is not surprising.10 And while Hartford 

Fire and earlier judicial decisions have found that the 

antitrust laws do apply, in the civil context, to foreign

conduct, this antitrust common law is not the express

statement of legislative intent that the Restatement suggests

may be appropriate in the criminal context.

 

10. Enforcement of criminal laws against foreign nationals
for conduct on foreign soil may affect this country's
relationship with the foreign country in somewhat different
ways than would a civil action. Congress could choose to
provide more explicit guidance to the executive and the
courts in this area if it is concerned about such impacts on
foreign relations.

29

Also relevant to the present inquiry is section 415

(2), which states that:

Any agreement in restraint of United
States trade that is made outside of the
United States, and any conduct or
agreement in restraint of such trade that
is carried out predominantly outside of
the United States, are subject to the
jurisdiction to prescribe of the United
States, if a principal purpose of the
conduct or agreement is to interfere with
the commerce of the United States and the
agreement or conduct has some effect on
that commerce.

Restatement 415(2). Comment a to Section 415 states that 

the reasonableness principles articulated in Section 403 must

still be satisfied. See id cmt. a. 

Application of these principles to the indictment

at issue here leads to the conclusion that the exercise of

jurisdiction is reasonable in this case. Here, raising

prices in the United States and Canada was not only a purpose 

of the alleged conspiracy, it was the purpose, thus 

satisfying Section 415's "principal purpose" requirement.

Moreover, Section 415's requirement of "some effect" on

United States markets is amply met here. The indictment

alleges that NPI sold $ 6.1 million of fax paper into the

United States during 1990, approximately the period covered

by the charged conspiracy. In 1990, total sales of fax paper

in North America were approximately $100 million. NPI's

price increases thus affected a not insignificant share of

the United States market.

30

These same factors weigh heavily in the Section 403

reasonableness analysis. Because only North American markets

were targeted, the United States' interest in combatting

this activity appears to be greater than the Japanese

interest, which may only be the general interest of a state

in having its industries comport with foreign legal norms.

Japan has no interest in protecting Japanese consumers in

this case as they were unaffected by the alleged conspiracy.

The United States, in contrast, has a strong interest in

protecting United States consumers, who were affected by the

increase in prices. In this situation, it may be that only

the United States has sufficient incentive to pursue the

alleged wrongdoers, thereby providing the necessary deterrent

to similar anticompetitive behavior. In another case, where

the consumers of the situs nation were injured as well, that

state's interest in regulating anticompetitive conduct might

be stronger than it is here.

Other Section 403 factors also counsel in favor of

the exercise of jurisdiction here. The effects on United

States markets were foreseeable and direct. The Government

of Japan acknowledges that antitrust regulation is part of

the international legal system, and NPI does not really

assert that it has justified expectations that were hurt by

31

the regulation.11 The only factor counseling against finding

that the United States' antitrust laws apply to this conduct

is the fact that the situs of the conduct was Japan and that

the principals were Japanese corporations. This

consideration is inherent in the nature of jurisdiction based

on effects of conduct, where the situs of the conduct is, by

definition, always a foreign country. This alone does not

tip the balance against jurisdiction.

For these reasons, I agree with the majority that

the district court erred in dismissing the indictment.

 

11. While criminal prosecution may come as a surprise, NPI
should have known that civil antitrust liability could
include treble damages. A corporation found guilty of a
criminal violation of Section One is subject to a fine not
exceeding $ 10 million. See 15 U.S.C. 2. Treble damages 
obviously do not include a similar cap. 

32